IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| David Duncan on behalf of himself and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| Cimarex Energy Co.; | ) ) |
| Defendant. | ) ) ) |

No. CIV-17-76-HE

## CLASS ACTION COMPLAINT

Plaintiffs bring this claim on behalf of themselves and the Class of all other persons similarly situated against Defendants and in support of these claims state as follows:

## NATURE OF THE ACTION

1.  Plaintiffs and the Class bring claims based upon Defendant's underpayment by taking improper Midstream Service Cost deductions or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Oklahoma (essentially Processing Costs since Defendant has a corporate policy not to deduct or allow the deduction of the other Midstream Service Costs). This is Round 2 of a similar but smaller case

settled class-wide in *Hitch Enterprises, Inc., et al. v. Cimarex Energy Co., et al.*, Case No. 5:11-cv-00013-W (W.D. Okla. Judge West).

## VENUE AND JURISDICTION

2. This Court has jurisdiction over Defendant in that its wrongful acts occurred and caused damages to Plaintiff and Class members in this judicial district. Defendant removed the case to this Court under CAFA.

3. Venue is proper in this Court for one or more of the following reasons: (i) many of the wells and royalties therefrom are located in this judicial district; (ii) Class members reside in this judicial district; and (iii) Defendant does substantial continuous business in this judicial district.

## PARTIES

4. Plaintiff David D. Duncan has a royalty interests in the Clarence Duncan 1-16 well in Custer County, Oklahoma. Cimarex Energy Co. holds the lease, operates the well, and pays the royalty on this well to Plaintiff David D. Duncan.

5. Defendant Cimarex Energy Co. ("Cimarex Energy" or "Defendant") is in the business of producing and marketing gas and constituent products from the wells in which Class members hold royalty interests. Cimarex Energy is believed to be a citizen of Colorado where its corporate headquarters are located and a citizen of Delaware where it is incorporated, and is doing

business in the State of Oklahoma. Cimarex Energy has appeared in this case, and can be served through its counsel.

6. Cimarex Energy is sued herein as a lessee and/or operator of Class Wells.

7. Cimarex Energy uses "work back" or "netback" pricing as the methodology to pay royalty owners, but does not deduct from royalties for Gathering, Compression, Dehydration, or Treatment, or the fuel used for those activities. It only deducts from royalties for Processing (and Plant Fuel) which includes TF&S for NGLs and the percentages of products retained by third party processors.[1]

8. The acts charged in this Petition as having been done by Defendant were authorized, ordered, or done by its officers, agents, affiliates, employees, or representatives while actively engaged in the conduct or management of Defendant's business or affairs, and within the scope of their employment or agency with Defendant.

---

[1] Because a prior putative class case has been filed against Cimarex Energy Company and Cimarex Energy Co. of Colorado to recover for FL&U and Plant Fuel deductions from royalties but only for leases that expressly state that royalty will be paid on gas used off the lease premises and/or in the manufacture of products, Plaintiff and the Class do not sue at this time in this case at all for FL&U or Plant Fuel, regardless of lease language or implied covenants. *See Reirdon v. Cimarex Energy Company and Cimarex Energy Co. of Colorado*, Case No. 16-cv-445-SPS (E.D. Okla.).

## CLASS ACTION ALLEGATIONS

9. Plaintiff brings this action individually and, pursuant to Rule 23(a) and (b)(3), as representatives of a Class defined as follows:

> All royalty owners in Oklahoma wells operated or leased by Cimarex Energy Company that have produced gas or gas constituents (such as residue gas, natural gas liquids, or helium) from January 1, 2013 to present.
>
> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States); (2) Defendants, their affiliates, and employees, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; (4) all royalty owners to the extent they have sued Defendants for underpayment of royalties from January 1, 2013 to the present before this suit was filed; (5) all royalty owners that expressly authorized in their leases the deduction of processing costs from royalties; and (6) all royalty owners to the extent their wells are both subject to the class action settlement in *Chieftain Royalty Co. v. QEP Energy,* No. 5:11-cv-00212-R, and the well was subsequently acquired by Defendant or any of its affiliates.

10. The prior *Hitch v. Cimarex Energy Co.* settlement releases Defendants and their affiliated entities before January 1, 2013.

11. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. For instance, Defendants have operated over 100 wells producing gas in Oklahoma and many more in which it holds a working interest, with at least one, and usually more, royalty owners for each well. There are more than 200 royalty owners. While many royalty owners remain in Oklahoma, many others reside in

numerous other states, and perhaps countries. Defendant has within its possession or control records that identify all persons to whom it as paid royalties from wells located within Oklahoma from January 1, 2013 to present.

12. The questions of fact or law common to Plaintiff and the Class include, without limitation, one or more of the following:

(a) Whether Plaintiff and the Class members are the beneficiaries of an implied duty to market obligating Defendant to place the gas (and its constituents) from Class Wells into Marketable Condition;

(b) Determining the point at which the gas (and its constituents) that Defendant produce becomes commercially marketable;

(i) Whether Marketable Condition for residue gas occurs at transmission pipeline quality as Plaintiff contends or earlier;

(ii) Whether Marketable Condition for NGLs occurs at fractionation quality as Plaintiff contends or earlier; and

(iii) Whether Marketable Condition for helium occurs at Grade A quality as Plaintiff contends or earlier;

(d) Whether Defendant deducted or allowed hired third parties to deduct (in cash or in kind) amounts for placing the gas (and its constituents) into Marketable Condition before paying royalty to Plaintiff and the Class members.

13. Plaintiff is typical of other Class members because Defendant pays royalty to Plaintiff and other Class members using a common method. Defendant pays royalty based on the net revenue Defendant receives under gas marketing contracts. The marketing contract terms are unknown to and

unapproved by royalty owners. The contracts are necessary to place the gas and its constituent parts into marketable condition. Plaintiff is also typical of the other Class members because his leases do not contain an express provision authorizing deductions of Processing Costs (Residue retained; NGLs retained, TF&S; Helium retained or not paid for at all).

14.     Plaintiff will fairly and adequately protect the interests of the members of the Class. The Class consists of royalty owners paid by Defendant. Plaintiff understands his duties as Class representative, and his interests in recovering for improper deductions do not conflict with the recovery of improper deductions by the Class. Plaintiff has retained counsel competent and experienced in class action and royalty owner litigation.

15.     This action is properly maintainable as a class action. Common questions of law *or* fact exist as to all members of the Class and those common questions predominate over any questions solely affecting individual members of such Class. *See* ¶ 12 above. There is no need for individual Class members to testify in order to establish Defendant's liability or even damages to the Class.

16.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum,

simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts and/or Defendant. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

17.   Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by the members of the Class because joinder of all members of those Class would be either highly impracticable or impossible and because the amounts at stake for individual Class members, while significant in the aggregate, are not great enough to enable them to enlist the assistance of competent legal counsel to pursue their claims individually. In the absence of a class action in this matter, Defendant will likely retain the benefit of its wrongdoing.

## **GAS INDUSTRY BACKGROUND**

18.   The members of the Plaintiff Class own interests in wells that produce gas and constituent products that are subject to uniform accounting methods and to applicable implied marketable product law that require the

lessee to bear all of the costs of placing the products, whether gas or its constituent parts, in "Marketable Condition."

19. The lessee under an oil and gas lease has the duty to produce marketable products, and the lessee alone bears the expense in making all products marketable.

20. Gas and its constituent parts are marketable only when in the physical condition to be bought and sold in a commercial marketplace, which for gas needing processing is after processing.

21. Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

22. The lessor owns minerals, including oil and gas, and the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology to find oil and gas, and drilling rigs becoming more efficient, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue. The oil and gas companies through

undisclosed internal accounting practices have tried to keep as much of the well revenue as possible. These accounting practices are at the heart of every oil and gas royalty owner case.

### Residue Gas, Helium, and Natural Gas Liquids Production

23.   The gas is gathered from each well, dehydrated and compressed, through gathering lines that are buried underground and cross many miles of land. The three primary well gas products--methane, natural gas liquids ("NGLs"), and helium--are further processed at processing plants before being trucked or piped to the commercial market and on to the end-user. A diagram illustrating the process is below:



**Wellhead (Basic Separation and Gas Measurement)**

24.     Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[2] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[3] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly into oil and water. The heater-treater is installed, maintained and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold. [The payment of oil royalties is not at issue in this lawsuit.]

---

[2]    Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from a pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

[3]    A minute portion of this raw or mixed gaseous product may be used on the leased land to heat the farm house pursuant to a free gas clause in the lease or sometimes sold to a small, limited local market with a finite demand to local irrigators near the wellhead. This limited local market accounts for less than 3% of a producer's gas production.

25. Since the pressure of many wells has depleted over the decades of production, sometimes wellhead compressors have been installed to suction gas out of the well or just to move the gaseous mixture. These wellhead compressors are installed, maintained and use fuel (the "wellhead compression" or "vacuum compression" cost). The gaseous mixture produced from a single well cannot be processed economically, so the mixtures are 'gathered' together through gathering lines and the aggregate mixture is put through a processing plant.

### Gathering Lines (Dehydration, Compression, Condensate)

26. As the gaseous mixture from each well enters the gathering line it is measured, both volume (in Mcf) and in quality (Btu content) (combined, "gas measurement" done in MMBtu). This is done in a meter run which must be constantly maintained to preserve accuracy (the "measurement cost"). Gathering pipelines are made of metal that could be corroded by any remaining water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor ("dehydrator cost"). Of course, gas cannot move unless it is pressurized, so large gas compressors are installed to move the gas down the gathering line. The gas must be pressurized high enough to overcome the back-pressure in the line and friction. These compressors are expensive and require fuel to operate (together, "gathering or field compression fee" and/or "gathering fuel"). The gathering pipelines

themselves cost money to lay and maintain ("gathering cost"). Gas condensate (gas condensed into liquid as it cools) is collected at points along the gathering lines as a result of cleaning or "pigging the line" ("Condensate" or "drip condensate"), and is captured for fractionation later. [4] Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U").

## Natural Gas Processing

27. Once the gas mixture is gathered from a sufficient number of wells (and often from multiple gathering systems), it enters the inlet of the processing plant. To process the gas into methane, crude helium, and mixed NGLs, lessees, such as Defendants, use gas processing plants. Sometimes the processing plant is owned by an unrelated third party and sometimes it is owned in whole or in part by lessees. Sometimes other impurities in the mixture must be removed such as carbon dioxide, nitrogen, or sulfur (the "treatment cost"). Methane gas (sometimes called "residue gas") must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission (FERC) which is called "pipeline quality gas". NGLs are used as a feedstock in the petrochemical and oil refining industries, and are worth more than methane. NGLs are separated from the gaseous mixture by cooling the mixture until the NGLs become separated. This cooling

---

[4] Plaintiff and the Class do not sue for underpayment or non-payment for drip condensate at this time.

or Cryogenic recovery method usually takes place at temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The mixture of NGLs is further moved down a liquids pipeline and processed by a fractionator for separation of the NGLs into their component parts ("T&F" or "fractionation"). Helium is processed into a crude mixture known as "raw helium" or "crude helium". Raw helium contains impurities and must be further processed into Grade A helium for commercial sale and use. This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel").

28. At the tailgate of the processing plant, at least three products emerge: (1) crude helium; (2) residue gas (or methane gas); and, (3) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). None are commercially marketable at that point.

## Marketable Condition for the Products

29. *Helium*. The Class Wells in the Oklahoma Panhandle contain recoverable helium. Crude helium (about 50%-80% pure) has little commercial use; instead, it has to be further processed into Grade-A helium (99.9% pure). http://minerals.usgs.gov/minerals/pubs/commodity/helium/heliumcs05.pdf The crude helium from the processing plant is then piped to one of the Grade A helium processing plants. Helium is extracted at the processing plants, but

Defendants do not pay royalty at all, or not completely, on the helium from Class members' wells from which it is recovered.

30. *Methane Gas*. Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

31. *NGLs*. The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products—ethane, propane, butane, isobutane, natural gasoline, etc. Defendant improperly deducts, in computing royalty for NGLs, processing fees and/or other costs (such as transportation and fractionation, T&F, sometimes called TF&S) needed to reach commercially marketable fractionated NGLs. Such deductions are improper.

## Sale of Products

32. To turn the gas products into money, the producer then sells the products. One would expect that such sales would occur in the commercial market place in an arm's length transactions. That, in fact, occurs, but lessees attempt to cover up and manipulate that fact by self-serving language in marketing contracts about title transfers or even by creating wholly owned affiliates to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

33. The "starting price" for gas products is almost always established by the lessee through a "weighted average sales price" or an "index price". If Defendant has the market power to, over time, obtain above "index price" in its arm's length sales, then as an agent for the royalty owner, the royalty owner is entitled to this higher price over time as well.

### Different Ways Defendant Underpays Royalty Owners

34. Defendant underpays Plaintiff and the Class in one or more of the following ways, without limitation:

(a) <u>Helium</u>. Helium is contained in commercial quantities in the well-stream produced and recovered from Class members' wells in the Oklahoma Panhandle, but Defendant: (i) fails to pay royalty for all of the helium produced; (ii) deducts processing fees and costs even though the helium is not yet in commercial grade; and, (iii) pays at a lower than commercial Grade A price.

(b) <u>Natural Gas Liquids (NGLs)</u>. Defendant: (i) fails to pay royalty for all of the NGLs produced (some is retained by the processor to pay for processing); (ii) deducts processing fees and expenses; (iii) and reduces payment by TF&S all before obtaining commercially marketable fractionated NGLs.

(c) <u>Residue Gas.</u> Defendant: (i) fails to pay royalty for all of the Residue produced (some is retained by the processor to pay for processing);

15

and, (ii) deducts processing fees and expenses, all before obtaining commercially marketable Residue.

## COUNT I—BREACH OF THE IMPLIED DUTY TO MARKET IN THE LEASE OR OCC FORCE POOL ORDER

35. Plaintiff and the Class incorporate by this reference the allegations in ¶¶ 1-34.

36. Defendant owes Plaintiff and the Class members the implied duty to market either under lease or under an order issued by the Oklahoma Corporation Commission ("OCC Order") and 52 O.S. §87.1(e) after May 8, 2012.

37. Plaintiff and the Class (or their predecessors in title) entered into written, fully executed, oil and gas leases with Defendant (or Defendant's predecessors in title).[5] Each of the attached leases and Class leases include implied covenants requiring Defendant to place the gas and its constituent parts in "Marketable Condition" at Defendant's exclusive cost. The leases also place upon Defendant the obligation to properly account for and pay royalty to royalty owners under the implied mutual benefit rule.

38. At all material times, Plaintiff and the Class have performed their terms and obligations under the leases.

---

[5] For Duncan, one lease is with Warren American Oil which was assigned in part to Cimarex Energy Co. and the other lease was with Cimarex Energy Co., which also operates the Duncan well, *see* Leases at ¶6 attached as **Exhibit A** and incorporated by reference.

39.   Defendant breached the implied duty to market in the leases or in the OCC Order by its actions and/or inactions.

40.   As a result of Defendant's breaches, Plaintiff and the Class have been damaged through underpayment of the actual amounts due.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an Order and Judgment against Defendant as follows:

a.   Certifying this action pursuant to Rule 23 (a) and (b)(3) as a class action, appointing Plaintiff as Class representative, and Plaintiff's Counsel as Class counsel with reasonable notice to be given to members of the Class;

b.   Awarding Plaintiff and the Class members' actual damages, including interest thereon, for Defendant's breach of the implied duty to market;

c.   Granting Plaintiff and the Class members the costs of prosecuting this action together with reasonable attorney's fees, expenses, and costs out of the recovery; and,

d.   Granting such other relief as this Court may deem just, equitable and proper.

## JURY DEMAND

Plaintiff and the Class demand trial by jury regarding all issues that can be tried to a jury under applicable law.

## ATTORNEYS' LIEN CLAIMED.

/s/  Rex A. Sharp

Rex A. Sharp OBA#011990
Rex A. Sharp, PA
5301 W. 75th Street
Prairie Village, KS 66208
(913)901-0505
(913) 901-0419 fax
rsharp@midwest-law.com

*Plaintiff's Counsel*

## CERTIFICATE OF SERVICE

This certifies that on March 30th, 2017, I transmitted the above document to the Clerk of Court using the CM/ECF system for filing, which will send notice of electronic filing to all counsel who have registered for receipt of documents filed in this matter.

/s/ Rex A. Sharp